## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **Sockeye Licensing TX LLC,** | Case No. 6:23-cv-229 |
| Plaintiff, | Patent Case |
| v. | Jury Trial Demanded |
| **Google LLC,** | |
| Defendant. | |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Sockeye Licensing TX LLC ("Sockeye"), through its attorney, Isaac Rabicoff, complains against Defendant Google LLC ("Google" or "Defendant") and alleges the following:

### PARTIES

1.      Plaintiff Sockeye Licensing TX LLC is a limited liability company organized and existing under the laws of Texas with its principal place of business at 320 Wilmette Avenue, Glenview, IL 60025.

2.      Defendant Google LLC is a corporation organized and existing under the laws of Delaware that maintains an established place of business at 500 W 2nd Street, Austin, TX 78701.

### JURISDICTION

3.      This is an action for Patent infringement arising under the Patent laws of the United States, Title 35 of the United States Code.

4.      This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

1

5.     This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in the Western District of Texas.  Specifically, Defendant provides its full range of services to residents in this District.  As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

## VENUE

6.     Venue is proper in this District under 28 U.S.C. § 1391(c) because Defendant is a foreign corporation. In addition, Defendant has committed acts of patent infringement in this District, and Plaintiff has suffered harm in this district.

## PATENTS-IN-SUIT

7.     Sockeye is the assignee of all right, title, and interest in United States Patent No. 9,547,981 (the "'981 Patent"), including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '981 Patent. Accordingly, Sockeye possesses the exclusive right and standing to prosecute the present action for infringement of the '981 Patent by Defendant.

8.     On January 17, 2017, the United States Patent and Trademark Office issued the '981 Patent.  The '981 Patent is titled "System, Method and Apparatus for Using a Wireless Device to Control Other Devices."  The application leading to the '981 Patent was filed on November 3, 2014, which is a continuation of U.S. Application No. 13/418,829; which was filed on March 13, 2012; which is a divisional application of U.S. Application No. 11/898,912, now the '342 Patent, which was filed on September 17, 2007; which claims priority from provisional application number 60/844,645, which was filed on September 15, 2006.  A true and correct copy of the '981 Patent is attached hereto as Exhibit A and incorporated herein by reference.

9.      Prior to the filing of the applications that matured into the '981 Patent, state of the art cell phone designs emphasized their use as standalone devices.  In the industry it was widely expected that, as the multimedia capabilities of the cell phone became richer, the cell phone itself would serve as a multimedia player and alternative to traditional modes of viewing video, such as via television screens.  Accordingly, cell phone manufacturers at the time of filing focused on developing the "onboard" capabilities of their products, rather than adapting them to connect with and control a higher resolution device.  Thus, for example, the Nokia N92 mobile device announced in 2005 was marketed as a phone for watching TV.  The Nokia N92, while capable of playing "mobile TV," was designed as an alternate platform for watching television, and it operated as a standalone device, wholly-independent of television sets of the period. The '981 Patent went further.  In contrast to the standalone approach of the Nokia N92, the '981 Patent taught particular systems and methods by which the cell phone could connect with and control a higher resolution display device, streaming video thereto.  The state-of-the-art cell phones of the day were not equipped to operate in this way, nor was this their goal.  Indeed, as Nokia stated at the time, the "Nokia N92 offers easy access to TV programs *without* having to sit in front of a television set."  Exhibit B.  Notably, so-called "[t]hird generation mobile phones" or "3G mobiles" which were capable of "multi-media communication" of this kind—i.e., "viewing TV on a mobile phone"—were far from the norm in 2006.  Exhibit C.  As NEC stated at the time, although such devices were "expected to be extremely popular," using a cell phone to view television was itself a "groundbreaking way to use mobile phones." *Id*.  Still more groundbreaking was the inventive approach of the'981 Patent, which went beyond the cell phones merely equipped to play television, such as the Nokia N92 and the NEC e636, and taught particular systems and methods by which the cell phone could connect with and control a higher

resolution display device for streaming video.  The claimed inventions would have been

inoperable on even the most sophisticated cell phones of the period, such as the Nokia N92 and

NEC e636, because they required significant technical advancements and improvements to the

hardware and software "stack" of the cell phone in order to enable their inventive functionality.

*See* Exhibit D.

**Background of the Patented Technology**

10.    The '981 Patent taught the hardware and software "stack" necessary to implement

the particular methods claimed in the Patents.  For example, Figure 3D illustrates the

relationships between the hardware and software components of the cell phone itself, as well as

the internet and a high-resolution display device, in terms of their hierarchy and I/O requirements

and functions. Figure 3D teaches a cell phone operating system that supports TCP/IP services, a

desktop browser and operating system within the cell phone, and the device drivers necessary to

manage streaming media as it is received from the network, rendered by the operating system,

and communicated to external devices.  Figure 3D teaches that the cell phone's device drivers

interact with the peripheral communications hardware and software that, in turn, communicates

with external display devices.  Further, Figure 3B shows that the peripheral communications

hardware and software interacts with multichannel USB, and IEEE 1394 and IEEE 802.11

protocols that, in turn, use a multiport wireless interface to communicate with a high-resolution

digital display device.  Without the hardware and software stack (or its equivalents) disclosed,

*inter alia*, in Figures 3B and 3D of the '981 Patent, the claimed inventions would have been

inoperable.  The hardware and software stack disclosed in the Patents was absent from the more

advanced cell phones of the day (e.g., the Nokia N92 and NEC e636), which were designed as

mere standalone devices—a completely different paradigm than that disclosed in the '981 Patent,

4

which teach the cell phone connecting with and controlling a higher resolution display device on which media may be streamed.

11.     In the few prior art examples where a cell phone was actually connected to another device, the cell phone was used in a manner completely different than that claimed in the '981 Patent, and for different purposes.  As the inventor pointed out during prosecution of the parent '342 Patent, the prior art merely "describe[d] a conventional tethering operation of a cell phone to a computer, and not peripheral cell phone control of the claimed invention."  Exhibit E [Prosecution History of '342 Parent Patent, Amendment, May 31, 2011, at 11].  According to the "conventional tethering operation[s]" of the prior art, the "PC or laptop connects to the internet via another PC's or a cell phone's wireless Internet connection, providing a bridge connection but not ceding control."  *Id*.  By contrast, the "instant invention," the inventor explained, "does not use a cell phone to connect a 'computer' to the Internet" — "[q]uite the reverse, the instant invention connects peripheral devices (connected to the computer) to the cell phone to create a desktop computing environment on the cell phone."  *Id*.  As the inventor described it in a later amendment during prosecution of the '342 parent Patent, the "present invention" was one "directed to an innovative approach to employ a cell phone or like PDA . . . to create a media center controlled by the user through the cell phone–without the usage of the computing power of the peripherals' PC."  Exhibit F.  [Prosecution History of '342 Patent, Amendment, January 17, 2012, at 31].  The inventor emphasized that in the prior art "the portable device is a mere tether" and "has zero control – the network server is running things directly" in the "traditional client/server relationship." *Id*. at 32.  By contrast, the parent '342 Patent "expressly involves and claims control of the peripheral device by the portable device, not at network control."  *Id*.  Thus, at best, the prior art contemplated the "conventional tethering" of the cell phone to the computer

for the purpose of improving the functionality of the computer according to the "traditional

client/server relationship."  The '981 Patent, however, claims and teaches improvements in the

cell phone hardware and software "stack," enabling it to control the high-resolution display

device, in a clear reversal of the "traditional client/server relationship" and departure from

"conventional tethering." As the inventor stated during prosecution of the '981 Patent, quoting

the summary of the invention, "'[t]he user may access' the movies and videos 'using the desktop

monitor' because, for example the 'user interfaces' of the web site providing this content 'can be

displayed through' the 'desktop monitor' " and "[t]hose 'user interfaces are sent to the 'desktop

monitor' by means of the 'wireless cell phone.' "  Exhibit G [Prosecution History of '981 Patent,

Sept. 7, 2016, Declaration of Michael D. Harold, at pages 3-4, para. 7(a)(4)].  None of the prior

art discloses the hardware and software "stack" necessary to execute this inventive and

unconventional functionality or to accomplish the objectives of the '981 Patent.

12.     As the inventor pointed out during prosecution of the '981 Patent, the methods

employed in the prior art failed to disclose, for example, the claimed step of "transmitting by the

mobile communications device of at least some of the particular movie or video to the display

device for display thereon **simultaneously** while at least some of the particular movie or video is

being downloaded from the server to the mobile communications device."  Exhibit H

[Prosecution History of '981 Patent, Sept. 9, 2016 Amendment, at 8] (emphasis added).  This

unconventional step of claim 1 of the '981 Patent not only distinguishes it from prior art methods

but constitutes one of the '981 Patent's "inventive concepts," both in its own right as well as in

combination with other claim elements, rendering the Patent eligible under 35 U.S.C. § 101.

Indeed, the inventor pointed out that this step "teaches away" from the prior art, which merely

"discloses that a document must be fully downloaded before it can be accessed," from prior art

6

wherein "content is fully downloaded *before* the mobile device 'detects' the display" or from prior art wherein "a movie or video conference is received or initiated *before* it is routed to the external display." (Emphasis added). As such, the inventor noted, the prior art "teach[es] away from the claimed methods*." Id*. at 8-9.

13.     As the inventor further noted during prosecution of the '981 Patent, the "claims are specifically limited to the field of consumer electronic entertainment, as contemplated by the specification." For example, claim 1 of the '981 Patent specifically limits the "electrical coupling" between the display device and the mobile communications device to be "for consumer electronic entertainment purposes," which puts "limitations . . . on the type of electrical couplings that are covered by the claims*." Id*. at 10-11.

14.     The USPTO issued the '981 Patent on January 17, 2017, without ever having rejected any of the claims under 35 U.S.C. § 101 during prosecution.

15.     The inventor of the '981 Patent conceived of the inventions disclosed and claimed therein and worked to commercialize them for several years. Among his goals (and later those of his company, Zamboola) was to provide hardware and software solutions for the mobile market to allow the interfacing of user information between devices in an enhanced way. Accordingly, after filing in 2006 the applications that eventually issued as the '981 Patent, he set to work prototyping solutions that reduced the claimed inventions to practice. Mr. Harold began by modifying an "open source" cell phone released after filing, the Openmoko "Neo," which had an operating system and some of the hardware necessary to support streaming media from the Internet to a high-resolution display device. However, because the software on the Neo proved to be too unstable for the purposes of the claimed inventions, the inventor was forced to migrate to an "Android" operating system. Still more modifications were necessary after migrating to

the Android OS, which was not designed for the purpose of streaming media to a high-resolution display device, and lacked the architecture for concurrent, multi-threaded operations and inter-process communications.  Subsequently, the inventor adapted open-source device drivers to these purposes.  Additionally, because the Neo had a USB port, the inventor developed a USB-to-VGA connector that allowed the cell phone to display media at the higher resolution VGA, controlled by the user via the Neo touchscreen. Thus, the conventional software and hardware components available required significant modifications from their original form before it was possible to integrate them into a prototype incorporating the claimed inventions.

16.     The '981 Patent is valid and enforceable.

17.     The '981 Patent describes a need to provide an improved paradigm for using a wireless cell phone or other such communications device as a central component of a desktop or other such computing environment.  Ex. A, 2:61-64.

18.     The '981 Patent describes a system, method and apparatus in which the user of a wireless cell phone device establishes a direct connection with a desktop computer monitor, keyboard, mouse or other component using any combination of wireline connections and wireless connections.  *Id.* at 1:30-36.

19.     The '981 Patent is not directed to a method of organizing human activity or to a fundamental economic practice long prevalent in commerce.  The '981 Patent describes a system that addresses a technical problem—using a wireless cell phone as a central component of a desktop or other computing environment that includes, in addition to a desktop computer monitor and a desktop keyboard and mouse, using the use of desktop speakers and a desktop printer. *Id.* at 3:7-12—with a technical solution: increasing the use of a cell phone as a connection,

communications and controlling device for desktop computers, digital display monitor and
keyboard and mouse. *Id.* at 3:41-48.

20.     The'981 Patent does not preempt the field or preclude the use of other wireless
cell phones.  For example, many companies offer currently offer rudimentary products that allow
a cell phone to project images, presentations and movies onto a nearby wall or surface. *Id.* at 2:9-
12.  The prior art also only uses cell phones as computing devices and not as a full-sized
computer monitor or other full-size digital output device for manipulating data or issuing
commands remotely through the handheld communications devices. *Id.* at 3:20-27.

21.     The '981 Patent does not take a well-known or established business method or
process and apply it to a general-purpose computer.  Instead, in an exemplary embodiment, they
describe a wireless cell phone as a central component of a desktop or other computing
environment that includes, in addition to a desktop computer monitor and a desktop keyboard
and mouse, the use of desktop speakers and a desktop printer. *Id.* at 3:7-12.  The desktop
computer monitors or other full-size digital display device is also used as a visual output device,
and a full-size keyboard and mouse are used as user input devices. *Id*. 2:66-3:1.

22.     The PTAB declined to institute an IPR against the asserted claim 21 of the '342
Patent in IPR2016-00989, and therefore determined that there was not a reasonable likelihood of
unpatentability on the given grounds.  *See RPX Corp. v. Sockeye Licensing TX, LLC*, IPR2016-
00989 (P.T.A.B. 2016) (declining to institute an IPR as to claims 21, 22, 25 and 26). In IPR2016-
01052, the Petitioner did not seek to institute an IPR of claim 21.  *See RPX Corp. v. Sockeye
Licensing TX, LLC*, IPR2016-01052 (P.T.A.B. 2016) (requesting an IPR for claims 11-19 and
58-76 and denying institution of an IPR for claims 60-61 and 69). In the application leading to
the '981 Patent, the Examiner expressly considered all of the IPR petitions filed against the '342

9

Patent referred to *supra*, and allowed the '981 Patent to issue over all the prior art cited in those

IPR petitions.

### FIRST CAUSE OF ACTION
### INDIRECT INFRINGEMENT OF THE '981 PATENT

23.     Sockeye incorporates the above paragraphs herein by reference.

24.     Defendant manufacturers various Pixel phones that are offered for sale in the

United States by, for example, visiting this website and selecting a product:

https://store.google.com/category/phones?pli=1&hl=en-US.  All of these products, together with

all of Defendant's products that are identical from a patent infringement perspective, are

collectively referenced hereinafter as the "Infringing Products."

25.     The Infringing Products allow, for example, a movie or video to be selected and

then downloaded from a server hosting a website to a user's Infringing Product, and then

wirelessly cast therefrom to the casting circuitry inside or attached to a suitable display (*e.g.*, a

television set).  When an Infringing Product is used as in this manner, that use involves the

performance of all of the steps recited in at least claims 1, 5 and 15-16 of the '981 Patent as, for

example, discussed in greater detail hereinafter:

        a.     The preamble of claim 1 recites a "method for downloading and viewing a

movie or video on a display device."  While it is not a positively recited limitation,

corresponding to the preamble of claim 1, each Infringing Product includes casting circuitry that

provides a screen mirroring or casting functionality.  This allows a user to cause, for example, a

movie or video to be downloaded from a server to the user's Infringing Product, and then

wirelessly cast therefrom to the casting circuitry associated with a suitable display.

        b.     Claim 1 recites "electrically coupling for consumer electronic

entertainment purposes a display device suitable for use in a media center environment with a

10

mobile communications device that does not form a part of the media center environment."
Corresponding to this limitation of claim 1, the display to which each Infringing Product casts a
movie or video forms a "display device" that is suitable for use in a media center environment
where a movie or video can be watched. The user's Infringing Product is not a part of that
environment. The user's Infringing Product is coupled to the casting circuitry inside the display
to which a movie or video is cast by means of a wireless network connection.

       c.      Claim 1 recites "causing a first graphic user interface to be displayed on
the display device that conveys information to a viewer of the display device about movies or
videos that are individually downloadable from a server for display on the display device for
consumer electronic entertainment purposes." Corresponding to this limitation of claim 1, when
selecting a movie or video, the graphic user interface ("GUI") is cast from Infringing Product to
the casting circuitry associated with the suitable display which then causes it to be displayed to
the user on the display device. By viewing the GUI, the user can select a movie or video to
watch on the display screen of the display device.

       d.      Claim 1 recites "receiving entertainment selection commands by the
mobile communications device to allow a particular one of the movies or videos to be selected
for downloading from the server based on visual feedback the viewer receives by reading or
interacting with the first graphic user interface shown on the display device." Corresponding to
this limitation of claim 1, the user selects a movie or video to watch by entering commands into
the Infringing Product. The user makes the selection by reading the GUI that is displayed on the
display screen associated with each Infringing Product.

       e.      Claim 1 recites "receiving by the mobile communications device of the
particular movie or video that is sent to it from the server based on the viewer's reading or

interaction with the first graphic user interface shown on the display device."  Corresponding to this limitation of claim 1, by selecting a particular video to be watched, the user's Infringing Product indicates to the server that the particular video should be sent to user's Infringing Product.  The user makes the selection by reading the GUI that is displayed on the display screen associated with each Infringing Product.

   f. Claim 1 recites "transmitting by the mobile communications device of at least some of the particular movie or video to the display device for display thereon simultaneously while at least some of the particular movie or video is being downloaded from the server to the mobile communications device."  Corresponding to this limitation of claim 1, the particular movie or video that the user selected is streamed from the server to the casting circuitry of each Infringing Product and then to the casting circuity associated with the suitable display while the user is watching it on the suitable display.

   g. Claim 1 recites "wherein the electrical coupling between the mobile communications device and the display device allows the particular movie or video to be sent there between when the mobile communications device is located a distance away from the display device at which a person watches a movie or video at home."  Corresponding to this limitation of claim 1, the wireless connection between the user's Infringing Product and the casting circuitry associated with the suitable display is sufficiently strong and robust to allow the user to watch the video when the Infringing Product is located, for example, between 10-15 feet away from the suitable display.

   h. Claim 5 recites the "method of claim 1, wherein the mobile communications device is adapted to communicate with the server via the internet."

Corresponding to this limitation of claim 5, the user's Infringing Product is adapted to communicate with the server via the internet.

      i.    Claim 15 recites the "method of claim 1, wherein the transmitting of the particular movie or video from the mobile communications device to the display device for display thereon occurs substantially simultaneously with the downloading of the particular movie or video from the server to the mobile communications device.  Corresponding to this limitation of claim 15, the particular movie or video that the user selected is streamed from the server to the casting circuitry associated with the suitable display via the casting circuit of the Infringing Product.

      j.    Claim 16 recites the method of claim 1, wherein the causing step includes downloading the GUI from the server to the Infringing Product.  Corresponding to this limitation of claim 16, the user's Infringing Product communicates with the server to allow it to send to the Infringing Product at least a portion of the GUI.

26.    A Google Pixel 7 Pro is an example of the Infringing Products.  At https://store.google.com/us/product/pixel_7_pro?hl=en-US, Defendant states that a user can deploy the Pixel 7 Pro product by "watching a show on your Pixel phone."  Upon information and belief, this is done by streaming the show from a website to the Pixel phone.  At https://support.google.com/pixelphone/answer/2865484?hl=en, the website describes the Infringing Products by saying that if "you have a Chromecast or other device that casts, you can mirror your Pixel phone's screen and audio on a TV."

27.    Upon information and belief, Defendant has specifically intended that its customers use the Infringing Products as described above in paragraph 26 and, therefore, that its

customers use the Infringing Products in a way that infringes at least claims 1, 5, and 15-16 of the '981 Patent.

28.     Thus, by promoting the above-mentioned uses of the Infringing Products, Defendant actively induces its customers to use the device to perform the steps of all claim elements of at least claims 1, 5 and 15-16 of the '981 Patent.

29.     Since at least the filing date of the instant complaint, Defendant has had knowledge of the '981 Patent, as well as knowledge that the above-mentioned uses of the Infringing Products induce Defendant's customers to infringe least claims 1, 5, 15-16 of the '981 Patent.  This infringement by Defendant's customers, which Defendant has induced, is ongoing and will likely continue during the pendency of this action.

30.     Sockeye is entitled to recover damages adequate to compensate it for such infringement in an amount no less than a reasonable royalty under 35 U.S.C. § 284.

31.     Sockeye is entitled to recover damages adequate to compensate it for such infringement by the Projector Infringing Products in an amount no less than a reasonable royalty under 35 U.S.C. § 284.

**SECOND CAUSE OF ACTION**
**INDIRECT INFRINGEMENT OF THE '342 PATENT**

32.     Sockeye incorporates the above paragraphs herein by reference.

33.     The Infringing Products allow, for example, a movie or video to be selected and then downloaded from a server hosting a website over the internet to the user's Infringing Product, and then wirelessly cast it from it to the casting circuitry associated with a suitable display device for display thereon.  When the Infringing Products are used in this manner, that use forms a system that meets all of the elements recited in at least claim 21 of the '342 Patent. For example:

14

a.      Claim 21 of the '342 Patent, which depends from independent claim 20, recites the preamble of claim 20 which references a "peripheral device control system, comprising."   While it is not a positively recited limitation, corresponding to the preamble of claim 21, each Infringing Product is wirelessly connected to a suitable display device.

b.      Claim 21 of the '342 Patent recites "a peripheral device."  Corresponding to this limitation, the suitable display device that is wirelessly connected to the Infringing Product forms a "peripheral" device.

c.      Claim 21 of the '342 Patent recites "an interconnector."  Corresponding to this limitation, the casting circuitry associated with the suitable display device to which the Infringing Product is connected forms an "interconnector."

d.      Claim 21 of the '342 Patent recites "said interconnector connecting, at the control of a user, a wireless device to said peripheral device, and."  Corresponding to this limitation, the casting circuitry associated with the suitable display device to which the Infringing Product is connected forms an "interconnector" that allows a user to cause a movie or video to be downloaded from a server to the user's Infringing Product, and then wirelessly cast from there to the casting circuitry associated with the suitable display device for display thereon.

e.      Claim 21 of the '342 Patent recites "downloading user information to said peripheral device."  Corresponding to this limitation, the casting circuitry associated with the suitable display device allows a user to cause a movie or video to be downloaded from a server to the user's mobile communications device, and then wirelessly cast from there to the casting circuitry associated with the suitable display to be shown thereon.

f.      Claim 21 of the '342 Patent recites said user information being stored on a server in a communications network."  Corresponding to this limitation, the movie or video

displayed on the display screen is stored in memory on the server and is accessible over the internet.

g.      Claim 21 of the '342 Patent recites "said peripheral device, upon receipt of the downloaded user information, employing said user information at the control of said user." Corresponding to this limitation, each Infringing Product, upon receipt of the movie or video, caused the selected movie or video to be shown to a user on the suitable display device. The display of the movie or video on the suitable display device is controlled by the user entering commands into the user's mobile communications device with reference to a GUI cast from the mobile communications device that is shown on the suitable display device.

h.      Claim 21 of the '342 Patent recites "wherein said peripheral device, controlled by said user from said wireless device, is part of a separate system, and." Corresponding to this limitation, the suitable display to which the Infringing Product is wirelessly connected forms a "display device" that is suitable for use in a "home media center environment." The mobile communications device is not a part of that environment which contains items such as amplifiers and pre-amplifiers. The mobile communications device is coupled to the casting circuitry associated with the suitable display device.

i.      Claim 21 of the '342 Patent recites "wherein said downloaded user information employed by said peripheral device creates an environment selected from the group consisting of desktop computing environment, a media center environment, a portable PC computing environment, a tablet computer computing environment and combinations thereof." Corresponding to this limitation, the suitable display device to which the Infringing Product is wirelessly connected forms a "display device" that is suitable for use in a "home media center environment."

16

j.      Claim 21 of the '342 Patent recites the "peripheral device control system according to claim 20, further comprising."  Corresponding to this limitation, the suitable display device to which the Infringing Product is connected forms a "peripheral device."

k.      Claim 21 of the '342 Patent recites "means for receiving, at said peripheral device, a wireless communication containing said downloaded user information transmitted from said wireless device; and."  Corresponding to this limitation, the casting circuitry associated with the suitable display device forms at least a portion of the "means for receiving."  It allows the movie or video cast from the Infringing Product to be shown on the suitable display device via a wireless connection therebetween.

l.      Claim 21 of the '342 Patent recites "means for employing, at said peripheral device, said downloaded user information."  Corresponding to this limitation, the suitable display device includes a screen and casting circuitry connecting the screen to the casting circuitry that forms at least a portion of the "means for employing."  It allows the movie or video to be shown on the display screen of the suitable display device.

34.    A Google Pixel 7 Pro is an example of the Infringing Products.  At https://store.google.com/us/product/pixel_7_pro?hl=en-US, Defendant states that a user can deploy the Pixel 7 Pro product by "watching a show on your Pixel phone."  Upon information and belief, this is done by streaming the show from a website to the Pixel phone.  At https://support.google.com/pixelphone/answer/2865484?hl=en, the website describes the Infringing Products by saying that if "you have a Chromecast or other device that casts, you can mirror your Pixel phone's screen and audio on a TV."

35.    Upon information and belief, Defendant has specifically intended that its customers use the Infringing Products as described above in paragraph 34 and, therefore, that its

customers use the Infringing Products in a way that results in the direct infringement of at

interconnector" that least claim 21 of the '342 Patent.

36.     Thus, by promoting the Infringing Products in this manner, Defendant actively

induces its customers to form the system that includes all of the elements of at least claim 21 of

the '342 patent.

37.     Since at least the time of the filing of the Complaint, Defendant has had

knowledge of the '342 Patent, as well as knowledge that its customers engage in the above-

mentioned uses of the Infringing Products in a manner that infringes at least claim 21 of the '342

Patent.  This infringement by Defendant's customers, which Defendant has induced, is ongoing

and will likely continue during the pendency of this action.

38.      Sockeye is entitled to recover damages adequate to compensate it for such

infringement in an amount no less than a reasonable royalty under 35 U.S.C. § 284.


## JURY DEMAND

39.     Under Rule 38(b) of the Federal Rules of Civil Procedure, Sockeye respectfully

requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Sockeye asks this Court to enter judgment against Defendant, granting the

following relief:

A.      A declaration that Defendant has infringed the Patent-In-Suit;

B.      An award of damages to compensate Sockeye for Defendant's indirect

        infringement of the Patents-In-Suit;

18

C.      An award of damages, including trebling of all damages, sufficient to remedy

      Defendant's infringement of the Patents-In-Suit under 35 U.S.C. § 284;

D.      An accounting of all damages not presented at trial;

E.      A declaration that this case is exceptional, and an award to Sockeye of reasonable

      attorneys' fees, expenses and costs under 35 U.S.C. § 285;

F.      An award of prejudgment and post-judgment interest; and

G.      Such other relief as this Court or jury may deem proper and just.

  Dated: March 30, 2023                              Respectfully submitted,

                                   /s/ Isaac Rabicoff
                                   Isaac Rabicoff
                                   Rabicoff Law LLC
                                   600 Mamaroneck Ave STE 400
                                   Harrison, NY 10528
                                   7736694590
                                   isaac@rabilaw.com

                                   **Counsel for Plaintiff**
                                   **Sockeye Licensing TX LLC**

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing document was served on all parties

who have appeared in this case on March 30, 2023 via the Court's CM/ECF system.


<u>/s/ Isaac Rabicoff</u>
Isaac Rabicoff